**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **HARPOLE ARCHITECTS, P.C., et. al.,** | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 09-1598 (ESH) |
| **LAURA G. BARLOW,** | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

Plaintiffs Harpole Architects, P.C. ("HAPC") and Jerry Harpole, Jr. have sued Laura Barlow, HAPC's former bookkeeper and administrative assistant, for common law fraud, intentional misrepresentation and conversion, breach of a fiduciary duty, and violations of the D.C. Merchant's Civil Recovery For Criminal Conduct Act, D.C. Code §§ 27-101 to 27-106 (the "Merchant's Act") and the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. §§ 1961-1968. Defendant now moves to dismiss plaintiffs' claims under RICO and the Merchant's Act, Harpole's claims, and plaintiffs' requests for attorneys' fees. For the reasons stated, the Court will dismiss plaintiffs' RICO claims and Harpole's claims for conversion, violation of the Merchant's Act, and breach of defendant's fiduciary duty. However, the Court will deny defendant's motion to dismiss Harpole's fraud and intentional misrepresentation claims and will deny without prejudice defendant's motion to dismiss plaintiffs' claims for attorneys' fees.

**BACKGROUND**

Harpole, a D.C. resident, is the founder and sole shareholder of HAPC, a professional corporation that provides architectural and interior design services. (Compl. ¶¶ 3-4, 6.) HAPC is incorporated in and has its principal place of business in the District. (*Id.* ¶¶ 3, 6.)

Barlow, a current resident of Utah, became HAPC's bookkeeper and administrative assistant on July 12, 2004. (*Id.* ¶¶ 5, 7.) She oversaw HAPC's finances, ordered office supplies, secured goods and services that the firm needed, "maintain[ed] the firm's day-to-day bookkeeping," wrote checks, and balanced the company books. (*See id.* ¶¶ 7, 44.) Defendant also "ensure[d] that the firm's financial matters were properly accounted for and that HAPC only incurred necessary and appropriate business expenses." (*Id.* ¶ 8.)

Plaintiffs allege that defendant "abused her position of trust" to steal tens of thousands of dollars from HAPC. (*Id.* ¶ 22.) First, defendant wrote checks to herself, her mother, and to "cash" on the firm's bank account. On November 12, 2004, defendant cashed a check for $4,881.14, supposedly to pay the company's payroll tax. Although she used some of the money to pay the tax, she kept $3,755.16 for herself. (*Id.* ¶ 23(f).) In December 2005, defendant deposited $9,000 worth of HAPC checks into her own bank account and concealed her act by destroying the cancelled checks and check stubs. (*Id.* ¶ 23(d).) On October 30, 2006, defendant used HAPC funds to write a check to her mother for $1,640. (*Id.* ¶ 23(m).) Though her mother was owed some amount by HAPC, plaintiffs allege that the check "far exceeded the value of the services she had performed." (*Id.*)

Second, plaintiffs allege that Barlow secretly used HAPC's accounts at various retailers and service providers for personal gain. Defendant shipped personal packages using the company's Federal Express shipping account, incurring $1,145.65 in shipping charges. (*Id.* ¶

23(e).)  Further, she entered into a contract with LexisNexis without plaintiffs' knowledge, incurring $13,856.38 in expenses.  (*Id.* ¶ 23(g).)  She used the account to conduct searches "concerning the property and income of her friends, her relatives, and her husband's ex-girlfriend."  (*Id.*)  Defendant also stole more than $19,000 by buying a series of items, using the corporate account at Staples and returning the items for store credit, and by using firm funds to buy personal items at a variety of retailers.  (*Id.* ¶ 23(h).)  She obtained more than $2,000 in reimbursements for various fraudulent claims for business-related meals.  (*See id.* ¶ 23(i).)  Plaintiffs also allege that defendant paid for other "personal expenses" on firm credit, although they do not detail the extent of her fraud.  (*Id.* ¶ 23(l).)

Third, plaintiffs allege defendant obtained additional compensation from HAPC's payroll service company.  (*Id.* ¶ 51(b).)  On August 24, 2006, Barlow submitted fraudulent payroll records requesting an extra $10,000 from payroll services and deleted the references to the transaction on the payroll report that was filed with the office.  (*See id.* ¶ 23(a).)  On September 28, 2006, Barlow received another $2,500 from the payroll service company after she again altered HAPC's payroll records.  (*Id.* ¶ 23(b).)  On November 28, 2006, Barlow submitted a third fraudulent record to the payroll service company and obtained $2,556.25.  (*Id.* ¶ 23(c).)

In April 2007, Harpole discovered that defendant had been stealing money from the company payroll fund and confronted her.  (*Id.* ¶ 9.)  Defendant "admitted that she had committed payroll fraud," and Harpole terminated her.  (*Id.*)  That same day, defendant repaid the stolen payroll funds.  (*Id.*)  On May 4, 2007, defendant sent Harpole an email stating that she was "prepared to pay back the company money as soon as possible."  Five days later, defendant went to a Staples store, returned goods she had originally purchased using HAPC funds, obtained credit on a gift card, and kept the card for her personal use.  (*Id.* ¶ 16.)  Harpole and HAPC

employees personally conducted an investigation into defendant's conduct, spending "hundreds of hours" exploring the "breadth of Barlow's fraud," which "reduced time spent on income-producing work." (*Id.* ¶¶ 11-12.) Although Harpole and Barlow agreed Harpole would not take "immediate legal action" in exchange for her promise to repay them through a series of regular payments, Barlow has not made any restitution since the summer of 2008. (*Id.*)

Plaintiffs allege that Barlow stole almost $80,000 and that HAPC employees have spent more than $75,000 in time and expenses investigating her conduct. (*Id.* ¶¶ 12-13.) Harpole also alleges that he suffered financially from defendant's fraud because she "misrepresented to [him] that the firm was short of cash . . . in furtherance of her scheme." (*Id.* ¶ 23(a).) Because of these misrepresentations, Harpole did not draw a salary in August, September, and November of 2006. (*Id.* ¶¶ 23(a)-(c).) Harpole also alleges that he was damaged by the costs of his investigation into Barlow's fraud. (*Id.* ¶¶ 10-13.)

Plaintiffs filed this action on August 21, 2009. They allege that defendant committed common law fraud, intentional misrepresentation (Count I) and conversion (Count II) and that she violated the Merchant's Act (Count III), her fiduciary duties (Count IV) and RICO (Count V). Plaintiffs seek to recover the monies that defendant stole, compensation for the money and time spent investigating the theft, lost income, attorneys' fees and compensatory damages for Harpole's emotional distress. (Compl. ¶¶ 24, 32, 42, 47, 52.) Plaintiffs also seek treble damages under the Merchant's Act and RICO. (*Id.* ¶¶ 42, 52.) Defendant now moves under Fed. R. Civ. P. 12(b)(6) for dismissal of Counts III and V, all claims by Harpole in his individual capacity on the grounds that he lacks standing, and plaintiffs' claim for attorneys' fees.

**ANALYSIS**

**I. STANDARD OF REVIEW**

"In determining whether a complaint fails to state a claim, [courts] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] . . . matters of which [courts] may take judicial notice," *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), including "public records," and documents "appended to [a] motion to dismiss and whose authenticity is not disputed" if they are "referred to in the complaint and are integral" to plaintiff's claim. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

When ruling on a Rule 12(b)(6) motion to dismiss, courts may employ a "two-pronged approach." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Courts must first assume the veracity of all "well-pleaded factual allegations" in the complaint. *Id.* Courts need not accept as true "'naked assertion[s]' devoid of 'further factual enhancement,'" *id.* at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), or "legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). A pleading must offer more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' . . . ." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).

Once the court has determined that there are well-pleaded factual allegations, it must determine whether the allegations "plausibly give rise to an entitlement to relief" by presenting "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" such that "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949-50 (quoting *Twombly*, 550 U.S. at 570). Merely pleading facts

"consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 1949.

## II.  RICO

Plaintiffs seek damages under RICO, which creates a cause of action for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). They allege defendant violated 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." A violation of this statute "consists of four elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *W. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (quoting *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 (D.C. Cir. 1991)). Defendant argues that plaintiffs have not adequately alleged that she was associated with a RICO enterprise or that she engaged in a "pattern of racketeering activity." (Def.'s Mot. at 5-12.)

### A.  "Employed by or Associated With" the RICO Enterprise

Plaintiffs allege that HAPC was a RICO enterprise, and that defendant was employed by or associated with it, as required by 18 U.S.C. § 1962(c). (Pls.' Opp'n at 8; Compl. ¶ 51.) Defendant argues that there was no RICO enterprise because she did not conspire with anyone and acted "*alone* as an individual . . . ." (Def.'s Reply at 6; *see also* Def.'s Mot. at 6-7.) "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001).

Plaintiffs allege that defendant was the "person" under § 1962(c) and that HAPC was the "enterprise." As a matter of law, HAPC qualifies as a RICO enterprise because it is a corporation. *See* 18 U.S.C. § 1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity"). Moreover, defendant does not contest that she was "employed by" HAPC. Therefore, plaintiffs have sufficiently alleged that defendant was employed by or associated with a RICO enterprise. *See Cedric Kushner*, 553 U.S. at 163 (holding that "an employee who conducts the affairs of a corporation through illegal acts comes within the terms of" RICO, even if the employee is the "sole owner" of the corporation).

### B. "Pattern of Racketeering Activity"

Defendant next argues that plaintiffs have failed to allege a "pattern of racketeering activity." (Def.'s Mot. at 8-12.) To meet this requirement, plaintiffs must establish that the predicate acts are "related" and "amount to or pose a threat of continued criminal activity." *W. Assocs. Ltd. P'ship*, 235 F.3d at 633 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). The Court of Appeals has noted that the Supreme Court has "interpreted the RICO Act broadly, to include many 'garden-variety fraud and breach of contract cases'" and has "refused to countenance procedural limitations" to the statute. *Id.* at 636 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 525 (1985) (Powell, J., dissenting)). However, the Court of Appeals has also emphasized that the pattern requirement "guard[s] 'against finding continuity too easily in the context of a single dishonest undertaking involving mail or wire fraud.'" *Id.* at 637 (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)). The pattern element exists, in part, to "prevent ordinary business disputes from becoming viable RICO claims," simply because the parties may have "used the United States mails or a fax machine . . . ." *Id.* Thus, where a plaintiff "alleges only a single scheme, a single injury, and

few victims, it is 'virtually impossible for plaintiffs to state a RICO claim.'" *Id.* at 634 (quoting *Edmonson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263 (D.C. Cir. 1995)).

Plaintiffs argue that they have satisfied the "pattern" requirement by alleging defendant conducted "several distinct (albeit related) fraudulent schemes" that injured "various banks and firm service providers." (Pl.'s Opp'n at 12-13.) In determining if plaintiff has alleged "relatedness" and "continuity," the Court must consider "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Edmonson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263 (D.C. Cir. 1995). In *Edmonson*, the Court of Appeals found that the defendant had not engaged in a "pattern" of racketeering activity, despite an alleged three-year period of fifteen separate acts, because there was a single scheme, a discrete injury, and a small number of victims. *Id.* at 1265. Similarly, this Court has found that seventeen acts of wire fraud over two years did not constitute a "pattern," where the acts were part of one scheme with four identified victims. *Lopez v. Council on American-Islamic Relations Action Network, Inc.*, No. 08-1989, 2009 WL 3069661, at *9 (D.D.C. Sept. 28, 2009).

Plaintiffs allege that defendant, acting alone, committed a single series of acts over three years.[1] And although banks and service providers may have been indirectly harmed as a result, HAPC was the real target of defendant's acts. Thus, plaintiffs have only alleged a single victim of defendant's fraud. *See W. Assocs. Ltd. P'ship*, 235 F.3d at 635 (holding that indirect injury to members of a partnership did not make the partners individual victims under RICO).

---

[1] It is unclear exactly how many separate acts defendant committed. Plaintiffs argue that they allege "many . . . significant" acts "of wire, mail and bank fraud," although they suggest that seven would be enough to satisfy the pattern requirement. (Pls.' Opp'n at 12.) But, as *Western Associates* makes clear, even "dozens" of acts may not be enough to outweigh the other *Edmondson* factors. *See W. Assocs. Ltd. P'ship*, 235 F.3d at 635-37 (finding no pattern where plaintiff alleged "dozens of predicate acts extending continually over an eight-year period").

Furthermore, defendant's alleged acts cannot be "subdivided" into distinct schemes because they were "similar in nature and purpose" and resulted in a "single harm rather than separate injuries" to HAPC. *Id.*  Thus, plaintiffs have only alleged the existence of a single scheme.  Finally, though defendant's scheme was dishonest, it amounts to a typical garden-variety fraud.  The pattern requirement "acts to ensure . . . that treble damage suits are not brought against isolated offenders for their harassment and settlement value." *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989).  Here, plaintiffs have alleged that defendant, acting alone over a three-year period, committed a limited number of similar acts as part of a single scheme to steal from one victim – her employer.  Under the test laid out by the Court of Appeals in *Edmondson*, this does not constitute a pattern of racketeering activity.

### C.  "Conducting or Participating In" the RICO Enterprise

Even if defendant's predicate acts constitute a pattern of racketeering activity, which they do not, she did not conduct or participate in the affairs of the enterprise. (Def.'s Mot. at 5.)  The Supreme Court has held that this element of § 1962(c) requires the defendant to "have some part in directing [the enterprise's] affairs" by "participat[ing] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 179, 185 (1993).  "[L]ower rung participants in the enterprise" will only be liable if they act "under the direction of upper management." *Id.* at 184.  Defendant was a "bookkeeper and administrative assistant," whose duties included "overseeing the firm's finances . . . as well as ordering office supplies and other goods and services."  She was not, however, a member of the "upper management" of the enterprise. (Compl. ¶ 7.)  The alleged enterprise was a small firm with a few employees, and defendant had "a great deal of responsibility to ensure that financial matters were properly accounted for." (*Id.* ¶ 8.)  Nonetheless, it cannot be said that she participated in "operating" or

"managing" the enterprise, because plaintiffs have not provided "further factual enhancement" to support their "naked allegation," *Iqbal*, 129 S. Ct. at 1949, that she played a part in "directing [its] affairs." *Reves*, 507 U.S. at 179; *see also Lockheed Martin Corp. v. Boeing Corp.*, 357 F. Supp. 2d 1350, 1360 (M.D. Fla. 2005) ("The issue here is . . . whether it can reasonably be inferred from the facts alleged in [plaintiff's] Amended Complaint that the . . . [d]efendants exercised some measure of control . . . ."). Nor do plaintiffs allege that she committed predicate RICO acts under the direction of any of the management at HAPC. Thus, she cannot be liable as a "lower rung" participant in the enterprise. *Reves*, 507 U.S. at 184, and thus, plaintiffs cannot sustain a RICO cause of action for this reason as well.[2]

## III.  HARPOLE'S STANDING

Defendant argues that Harpole's remaining claims against her should be dismissed because under the "shareholder standing" rule, he has no individual standing to bring suit.[3] (Def.'s Mot. at 3-4.) Pursuant to this "longstanding equitable restriction," shareholders cannot sue to enforce corporate rights except in limited circumstances. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). The rule is rooted in the "principle that a litigant cannot sue in federal court to enforce the rights of third parties." *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008). Thus, the rule does not apply where shareholders with a "direct, personal interest" in the cause of action bring suit, even if "the corporation's rights are also implicated," because the shareholders are suing to enforce their own rights, not the corporation's. *See Franchise Tax Bd.*, 493 U.S. at 336.

---

[2] As plaintiffs have failed to allege that defendant participated in the operation or management of the alleged enterprise, the Court need not consider defendant's arguments that plaintiffs failed to allege a pattern of racketeering activity. (Def.'s Mot. at 7-13; Def.'s Reply at 7-9.)

[3] Having concluded that plaintiffs have not alleged a RICO violation, it is immaterial whether Harpole has standing to make that claim. *See supra* Part II.

Defendant argues that Harpole lacks standing to bring suit in his individual capacity because his injuries derive from those "inflicted on the corporation." (Def.'s Reply at 4.) Thus, as no shareholder has standing to sue "on a claim that belongs to the corporation," Harpole's individual claims should be dismissed. *Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 n.14 (D.C. Cir. 1984). Harpole responds that he has properly stated an individual claim because the "emotional distress damages" he alleges are distinct from HAPC's injuries, and because he has lost personal income as a result of defendant's fraud and the subsequent investigation. (Compl. ¶¶ 24(c), (f); 32(c), (f); 42(c), (f); 47(c), (f); 52(c), (f).) To determine if a "shareholder's claims are derivative of the corporation's claims for standing purposes" and thus barred by the shareholder standing rule, courts "apply the law of the state of incorporation." *Termorio S.A., E.S.P. v. Electrificadora Del Atlantico S.A., E.S.P.*, 421 F. Supp. 2d 87, 92 (D.D.C. 2006).

HAPC is a D.C. corporation, so the Court will apply District law to determine whether Harpole's claims are derivative. Although District law does not provide a definite test for evaluating shareholder standing, the D.C. Court of Appeals refused to allow a corporate shareholder to sue individually where it lacked a separate "legal interest" that had been harmed. *See Estate of Raleigh v. Mitchell*, 947 A.2d 464, 470 & n.7 (D.C. 2008) (holding that, because plaintiff "had no legal interest in the real property belonging to the corporation, it could not sue individually to redress any alleged wrongs against the corporation's property interests."). The shareholder standing rules in Delaware and Maryland similarly require a separate, legal interest.[4]

---

[4] Generally, D.C. courts "may look to the law of other jurisdictions in interpreting comparable laws or rules, absent definitive authority in this jurisdiction." *Behradrezaee v. Dashtara*, 910 A.2d 349, 356 (D.C. 2006). Thus, the D.C. Court of Appeals has looked to Delaware for guidance on matters of corporate law. *See id.* at 356-58 (citing Delaware law in discussing requirements of pleadings in a shareholder derivative lawsuit). D.C. courts also "look to Maryland law because the District of Columbia derives its common law from Maryland as of 1801." *West v. U.S.*, 866 A.2d 74, 79 n.1 (D.C. 2005).

*See Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del. 1988) (requiring "more than an injury resulting from a wrong to the corporation" and insisting that plaintiff be "injured *directly* or *independently* of the corporation"); *Mona v. Mona Elec. Group*, 934 A.2d 450, 464 (Md. Ct. Spec. App. 2007) ("A shareholder may bring a direct action . . . to enforce a right that is personal to him."). Thus, to have standing, Harpole must identify a legal interest that has been directly or independently harmed, i.e., a "special injury" that does not derive from the injury to the corporation. *See Labovitz v. Wash. Times Corp.*, 172 F.3d 897, 901 (D.C. Cir. 1999) (citing *Cowin v. Bresler*, 741 F.2d 410, 414-15 (D.C. Cir. 1984)); *see also Mona*, 934 A.2d at 464 (holding that a stockholder must "allege that he has suffered an injury that is separate and distinct from any injury suffered either directly by the corporation or derivatively by the stockholder because of the injury to the corporation" (internal quotation marks omitted)).

Harpole's attempt to distinguish the financial harm to HAPC from his individual, emotional distress does not give him standing to sue. A shareholder plaintiff must allege a "particularized, *nonderivative* injury" in order to "deflect application of the usual shareholder standing rules." *Pagan v. Calderon*, 448 F.3d 16, 29 (1st Cir. 2006) (emphasis added). Courts generally do not allow personal actions based on "emotional distress" deriving from "economic damages . . . suffered by the corporation." *See, e.g.*, *Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1072-73 (10th Cir. 2002); *Pagan*, 448 F.3d at 29 ("The fact that the complaint contains a demand for emotional distress damages . . . is insufficient to confer individual standing on any of the stockholders."). Harpole's alleged emotional distress clearly derives from the harm suffered by HAPC. "To cinch matters . . . the corporation itself also has sued, in the same complaint and on the same theories, for the same harm." *Pagan*, 448 F.3d at 29. Harpole's emotional distress derives from the harm to HAPC and cannot provide standing.

However, to the extent that Harpole suffered direct harm as a result of "losses of money and property . . . in his individual capacity," he has standing. (Pls.' Opp'n at 7.) Fraud "may give rise to claims for direct shareholder recovery" if it "causes separate and distinct injury." *Arent v. Distribution Sci., Inc.* 975 F.2d 1370, 1373 (8th Cir. 1992). Harpole alleges that he took no salary during certain pay periods because defendant fraudulently informed him that "the firm was short of cash." (Compl. ¶ 23(a).) Thus, unlike his emotional distress claim, Harpole's claim for lost wages is a special, individualized injury, based on direct harm caused by defendant's alleged misrepresentations and does not derive from HAPC's injuries. (*Id.* ¶¶ 23(a)-(d).) Therefore, he has standing to bring claims against defendant for fraud and intentional misrepresentation.

In contrast, Harpole lacks standing to sue for conversion, breach of fiduciary duty, and a violation of the Merchant's Act. Harpole does not allege that defendant wrongfully converted any property to which he had a "separate, legal interest" outside his role as a shareholder in HAPC. *See Estate of Raleigh*, 947 A.2d at 470. Nor does he allege that defendant owed him a "special" fiduciary duty. *Labovitz*, 172 F.3d at 901. Rather, he alleges that defendant "breached her fiduciary duty to HAPC . . . ." (Compl. ¶ 45.) And though Harpole declares himself a "merchant" in his complaint (*id.* ¶ 39), this is precisely the sort of conclusory allegation that the Court is not required to accept under *Iqbal*. 129 S. Ct. at 1949. Harpole does not explain how his interest in selling consumer services was special or distinct from HAPC's interest. Even if he could allege a separate interest, he cannot explain how the harm he suffered, as a merchant, was separate from the harm done to HAPC. Therefore, Harpole has no standing to bring Counts II, III and IV.

**IV.  THE MERCHANT'S ACT**

The Merchant's Act allows a "merchant" to bring an action for treble damages against "[a]nyone who commits an offense of fraud, shoplifting, or theft from [her] . . . ."  D.C. Code § 27-102 (a).  A merchant is someone who "does or would sell, lease, or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice."[5] *Id.* § 27-101(3).  The Act defines fraud, in relevant part, as "engag[ing] in a scheme or systematic course of conduct with intent to defraud or to obtain property of another" through false "pretense[s], representation[s], or promise[s] . . . ."  *Id.* §§ 27-101, 27-3221.  Shoplifting is defined as taking one of a number of predicate acts with the "intent to appropriate without complete payment any personal property of another that is offered for sale or with intent to defraud the owner of the value of the property."  *Id.* §§ 27-101, 27-3213.  "Theft" is the wrongful obtaining or use of "the property of another with intent" to either "deprive the other of a right . . . or benefit" of the property or to "appropriate the property . . . ."  *Id.* §§ 27-101, 27-3211.

Defendant argues that the Merchant's Act should not apply to her because it is "basically a shoplifting statute" that applies only to "goods or merchandise" that merchants are "in the business of selling to third parties" or "to the public. . . ."  (Def.'s Mot. at 13, 15.)  The Court must "construe D.C. law as it has been interpreted by the D.C. Court of Appeals – or, in the absence of such guidance, as [it] predict[s] that court would interpret it."  *Griffith v. Lanier*, 521

---

[5] The D.C. Court of Appeals has held, in the context of the Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 to -3913, that professional services, such as legal services, qualify as "trade practices."  *See Banks v. Dist. of Columbia Dept. of Consumer and Regulatory Affairs*, 634 A.2d 433, 437 (D.C. 1993).  *See also Dorn v. McTigue*, 157 F. Supp. 2d 37, 47-48 (D.D.C. 2001) (doctors are merchants under the CPPA).  HAPC alleges, and defendant does not contest, that it supplied professional architectural and interior decorating services.  (Compl. ¶ 6; Answer ¶ 6.)  These services are within the scope of the Act.

F.3d 398, 401 (D.C. Cir. 2008). As this issue appears to be one of first impression, the Court must try to anticipate how the D.C. Court of Appeals would interpret the statute.

"Interpretation of a statute or regulation 'begins with the language of the statute itself.'" *Carr v. District of Columbia*, No. 06-0098, 2006 WL 6003758, at *2 (D.D.C. July 26, 2006) (quoting *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 180 (D.C. Cir. 2003)) (interpreting D.C. law). Defendant's argument that the Act applies only to goods that merchants are "in the business of selling to third parties" or "to the public" is flawed. (Def.'s Mot. at 13, 15.) The statute covers "[a]nyone" who commits "fraud, shoplifting, or theft" from a merchant. D.C. Code. § 27-102. Shoplifting is explicitly limited to "items offered for sale," while fraud and theft apply to any "property of another." Were the Act "basically a shoplifting statute," there would be no reason to include "fraud" and "theft" as predicate acts, and no reason to explicitly import the definitions of "fraud," and "theft," which clearly extend beyond mere shoplifting. Further, the text of the Act does not limit its scope to "goods or merchandise;" rather, the definition of a merchant includes those who sell, lease or transfer consumer services. It is the Court's "'duty to give effect, if possible, to every clause and word of a statute . . . .'" *Sierra Club v. Envtl. Prot. Agency*, 536 F.3d 676, 680 (D.C. Cir. 2008) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)). There is simply no support in the statute for the interpretation that defendant suggests.[6]

---

[6] Defendant cites *Carr*, 2006 WL 6003758, to support using the legislative history to reinterpret the statute, suggesting that a literal reading "leads to preposterous results . . . ." (Def.'s Reply at 10-12.) But it is hardly preposterous that plaintiff would be liable for stealing from her employer under a statute that forbids committing "fraud . . . or theft from a merchant." D.C. Code § 27-102. Further, in *Carr* the Court merely found it "noteworthy" that the legislative history confirmed the existence of ambiguity in a statute. *Carr*, 2006 WL 6003758, at *4. Here, defendant asks the Court to narrow the scope of the Merchant's Act by requiring plaintiffs to prove their "goods and services" were taken. (Def.'s Reply at 9.) "Where, as here, the plain language of the statute is clear, the court generally will not inquire further into its meaning, at

Defendant argues that applying the Act here would create "super-plaintiff[s]" with litigation rights "superior to" those of other "victims of theft" (Def.'s Reply at 10) and would necessarily allow a "merchant who sells groceries" to sue a burglar who broke into her home and stole a wrench. (Def.'s Mot. at 15.) Of course, the Court is not presented with such facts, for HAPC, a merchant, alleges that defendant defrauded it of money that would otherwise have been used to operate its business. It is not necessary for this Court to define the outer boundaries of the Act to resolve defendant's contention. HAPC alleges that it is a merchant and that defendant committed fraud and theft against it in its capacity *as a merchant*. (Compl. ¶¶ 23, 36-39.) Thus, it has stated a claim under the Act.

## V. ATTORNEYS' FEES

Plaintiffs seek attorneys' fees pursuant to all five counts. Defendant argues that plaintiffs are not entitled to attorneys' fees for their common law claims because they cite no statute or contract specifically providing for fee-shifting. (Def.'s Mot. at 16-17.) Though the Court has dismissed plaintiffs' RICO claims, the Merchant's Act states that attorneys' fees "shall be awarded . . . without regard" to defendant's ability to pay. D.C. Code. § 27-106. Thus, to the extent HAPC can recover under the Act, it will be entitled to attorneys' fees.[7]

Plaintiffs may also be entitled to attorneys' fees "upon clear and convincing evidence of bad faith in litigation." *Oliver v. Mustafa*, 929 A.2d 873, 879 (D.C. 2007). While there is no

---

least in the absence of 'a clearly expressed legislative intent to the contrary.'" *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir 1995) (internal citations omitted). *See also Grant Thornton, LLP v. Office of Comptroller of the Currency*, 514 F.3d 1328, 1334 (D.C. Cir. 2008) (holding that if the text of a statute is "clear enough," then "resort to legislative history is unnecessary"). Because the language of the statute is clear, defendant's use of legislative history is unnecessary.

[7] As Harpole lacks standing to bring claims under the Merchant's Act, he may not recover attorneys' fees under this provision. *See supra* Part III.

such allegation of bad faith at this time, "[a]t this early stage of the litigation, [defendant's] motion to strike [plaintiffs'] attorneys' fees request is premature, as later developments may provide a legitimate basis for an attorneys' fees award." *Pinnacle Airlines, Inc. v. Nat'l Mediation Bd.*, No. 03-1642, 2003 WL 23281960, at *3 (D.D.C. Nov. 5, 2003). The Court will therefore deny defendant's request to dismiss plaintiffs' claims for attorneys' fees without prejudice. *See id.*

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is granted in part. The Court dismisses plaintiffs' RICO claims, Harpole's claims for conversion, breach of fiduciary duty, and under the Merchant's Act, but it denies defendant's motion to dismiss Harpole's claim under the common law of fraud and intentional misrepresentation. Finally, the Court denies as premature defendant's motion to dismiss plaintiffs' claims for attorneys' fees. An Order consistent with this Memorandum Opinion is being issued this date.

/s/

ELLEN SEGAL HUVELLE
United States District Judge

Date: November 9, 2009